[CB1] 
 
 
 




 

 

 

 

 

 

                                                COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                                 NO.
2-08-262-CR

 

 

TRENT MICHAEL CAMPBELL                                                            APPELLANT

 

 

                                                             V.

 

 

THE STATE OF TEXAS                                                                             STATE

 

                                                       ------------

 

          FROM
COUNTY CRIMINAL COURT NO. 10 OF TARRANT COUNTY

 

                                                       ------------

 

                                                      OPINION

 

                                                       ------------

I. 
Introduction

In a
single point, Appellant Trent Michael Campbell appeals his conviction for
driving while intoxicated (ADWI@).  We affirm.

II. 
Background








Southlake
Police Sergeant James Polley and Officer David Aldridge were the only witnesses
to testify at Campbell=s DWI trial.  The DVD from Officer Aldridge=s vehicle=s
dashboard camera (ADVD@) and the
jail videotape of Campbell receiving his statutory warning regarding giving a
breath specimen were also admitted in evidence and published to the jury, along
with a copy of the statutory warning signed by Campbell.

A.  Sergeant Polley=s
Testimony

Sergeant
Polley testified that on March 29, 2008, around 1:15 a.m., he received
information about a possible drunk driver. 
He proceeded to a nearby intersection to wait for the vehicle, a silver
Mitsubishi, to drive by, and then he followed it, describing its manner of
driving as follows:

The Mitsubishi was traveling with both left side tires over the centerCthe center stripes, and
then would drift back across and the right side tires would go.  And on that street it=s an old county road and
it has bar ditches on either side and the shoulders are very narrow and dirt,
so it pretty much goes road surface to dirt to bar ditch.  And he put both right side tires into theCjust about into the bar
ditch and then would come back in, and he did that numerous times.

 

 








Sergeant
Polley described the Mitsubishi=s
line-crossing as Aall the way over to about where the
hood ornament would be on a normal car. 
It would be two to three feet over onto the right-hand side or to the
left of the center turn stripe.@  He followed the Mitsubishi for around a
minute and a halfCnot more than a mileCduring
which time the Mitsubishi almost hit a culvert,[1]
causing him to fear for the driver=s safety Aand for
anybody else[] he happened to cross.@ He followed
the Mitsubishi into a residential neighborhood, parked behind it, and waited
several minutes for Officer Aldridge to arrive.[2]  He testified that no one entered or exited
the vehicle while he waited. 

B.  Officer Aldridge=s
Testimony

Officer
Aldridge testified that on March 29, 2008, during his 6 p.m. to 6 a.m. shift,
there was a general broadcast about a possible drunk driver in a silver
Mitsubishi, who was being followed first by a civilian on a cell phone and then
by Sergeant Polley.  Officer Aldridge did
not see Campbell driving.  He testified
that he found the silver Mitsubishi parked on the residential street with its
engine turned off; Sergeant Polley=s vehicle
was parked behind it.

Officer
Aldridge found Campbell, either sleeping or passed out, in the silver
Mitsubishi when he approached it.  He
testified that he noticed that Campbell smelled of alcohol; when Campbell woke
up, he automatically reached for the ignition. 
Officer Aldridge told him to give him the keys and to step out of the
car.  He observed that Campbell slurred
his words, and he testified that he felt that Campbell was a danger to himself
or others.  He put handcuffs on Campbell
and placed him in the back seat of his patrol car, testifying that he detained
Campbell Abecause [he] knew it was going to
be at least a public intoxication or minor in consumption.@  He also testified that he asked Campbell if
he had had anything to drink that night and that Campbell replied that he had
been drinking with some friends.  Officer
Aldridge admitted that he continued asking Campbell questions even though he
was arresting Campbell, or at least detaining him, based on a public
intoxication charge.  Officer Aldridge
then placed Campbell in his patrol car so he could speak with Sergeant Polley
about what Sergeant Polley had seen.

Officer
Aldridge subsequently administered the horizontal gaze nystagmus (AHGN@) field
sobriety test to Campbell at Sergeant Polley=s
prompting.  He testified that the test
resulted in six cluesCthe maximumCand then
he placed Campbell under arrest for suspicion of DWI after Campbell refused to
perform additional field sobriety tests. 
And he testified that based on his experience and observations that
night, he came to the conclusion that Campbell had lost the normal use of his
mental and physical faculties due to alcohol use, based on his demeanor, Athe
stumbling around, staggering, and his speech.@  Campbell refused to give a breath sample
after he was transported to jail, and he received his Miranda warnings[3]
after he received the statutory warning about the consequences of refusing a
breath sample. 

C.  Dashboard Camera DVD

The
dashboard camera DVD corroborates Officer Aldridge=s
testimony. Specifically, it shows Officer Aldridge approaching the Mitsubishi
with a flashlight, shining the flashlight through the driver=s side
window, and opening the driver=s side
door.  Some movement occurs inside the
Mitsubishi, and Officer Aldridge tells Campbell to leave his car turned off, to
give him the keys, and to step out of the vehicle.  Campbell steps out of the vehicle on his own.

Officer
Aldridge then asks Campbell how old he is. 
Campbell responds that he is nineteen. 
He asks Campbell if he has any identification on him, and Campbell
responds that he does not.  He asks
Campbell how much he has had to drink tonight and whether it was a couple of
beers.  Campbell responds, Ayes, sir.@  Officer Aldridge handcuffs Campbell and then
asks him whether he knows that he is not old enough to be drinking. Campbell
replies, Ayes.@  Officer Aldridge then states, ABut you
did it anyway.  Right?@  Campbell says, ARight.@ He asks
Campbell where he has been tonight; Campbell=s
response is unintelligible except for the word Ahouse.@  Campbell then insists that he had not been driving.  Officer Aldridge responds, AYou just
got through driving and parked right here,@ and then
asks him off-camera, after informing him that he has been followed by police
officers, AIf you wasn=t [sic]
driving, who was?@ Campbell=s
response is unintelligible.  Off-camera,
Officer Aldridge tells him to wait Aright
here@ and the
sound of the patrol car=s door closing can be heard on
the DVD.








When
Officer Aldridge administers the HGN test to Campbell, Campbell demonstrates
trouble following the instructions. 
Officer Aldridge asks him if he has been doing anything besides
drinking, and Campbell says no. When asked if he has been doing any drugs,
Campbell states, ANo drugs at all.@  As Officer Aldridge puts Campbell in the
patrol car (off-screen), Campbell asks what the charge is.  Officer Aldridge replies, ADriving
while intoxicated,@ to which Campbell again argues
that he had not been driving.

Campbell
can clearly be heard to slur his words throughout, and he visibly sways during
the administration of the HGN test.  The
DVD also shows that Officer Aldridge was not by himselfCafter he
opens Campbell=s car door, another uniformed
officer approaches the vehicle and an officer in plain clothes walks to the
passenger side of the vehicle.  They both
stand there while Officer Aldridge handcuffs Campbell. 

D.  Jail Videotape

The
videotape of Campbell receiving his warnings at the jail and refusing to give a
breath sample also shows that Campbell has trouble stating his birth date and
that he refuses the offer of more sobriety tests.  He clearly slurs his words and has trouble
understanding what is going on, asking Officer Aldridge what he is signing [the
statutory warning] after it has been read to him and a copy given to him to
read along, and trying to bargain, AI will
sign it if my mom can come pick me up.@  Officer Aldridge tells him more than once
that he has to see a judge and set a bond before anyone can come pick him
up.  After he receives his Miranda
warnings, he asks Officer Aldridge, AWhen can
my lawyer come get me?@

E.  Procedural Posture, Findings, and Conclusions

Campbell
was charged with DWI, and he filed a motion to suppress, which the trial court
denied after carrying the motion along during trial.  A jury found Campbell guilty of DWI, and the
trial court assessed a $500 fine, ninety days=
confinement (suspended), and twenty-four months of community supervision.

After
this appeal was filed, this court abated the case and remanded it to the trial court
for findings of fact and conclusions of law regarding the voluntariness of
Campbell=s
statements at issue.  See Tex.
Code Crim. Proc. Ann. art. 38.22, ' 6
(Vernon 2005); Urias v. State, 155 S.W.3d 141, 142 (Tex. Crim. App.
2004).  The trial court=s findings
of fact parallel the information set forth above in our review of Sergeant
Polley=s and
Officer Aldridge=s testimonies.[4]

The trial
court made the following conclusions of law: 
(1) Officer Aldridge had reasonable suspicion, based on specific
articulable facts, to detain the defendant for investigation of whether he had
been driving on a public roadway while intoxicated; (2) Having detained the
defendant for further investigation, Officer Aldridge was entitled to ask a
moderate number of questions to gather information to confirm or dispel his
suspicions; (3) The defendant was not in custody for purposes of Miranda
and Article 38.22 at the time he admitted he had been drinking, and his
statement was not, therefore, the result of custodial interrogation; and (4)
Further, the defendant=s statement that he had been
drinking was freely and voluntarily made, and was not the result of duress,
threat, physical force or any other unlawful persuasion.  This appeal was automatically reinstated upon
submission of the trial court=s
findings of fact and conclusions of law.

III.  Motion
to Suppress

In his
sole point, Campbell argues that the trial court erred by denying his motion to
suppress because he was arrested without a warrant and was not properly
notified of his rights in violation of his constitutional and statutory rights,
with specific reference to Miranda as codified by article 38.22 of the
code of criminal procedure.

A.  Standard of Review

We review
a trial court=s ruling on a motion to suppress
evidence under a bifurcated standard of review. 
Amador v. State, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); Guzman
v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).  In reviewing the trial court=s
decision, we do not engage in our own factual review.  Romero v. State, 800 S.W.2d 539, 543
(Tex. Crim. App. 1990); Best v. State, 118 S.W.3d 857, 861 (Tex. App.CFort
Worth 2003, no pet.).  The trial judge is
the sole trier of fact and judge of the credibility of the witnesses and the
weight to be given their testimony.  Wiede
v. State, 214 S.W.3d 17, 24B25 (Tex.
Crim. App. 2007); State v. Ross, 32 S.W.3d 853, 855 (Tex. Crim. App.
2000), modified on other grounds by State v. Cullen, 195 S.W.3d 696
(Tex. Crim. App. 2006).  Therefore, we
give almost total deference to the trial court=s rulings
on (1) questions of historical fact, even if the trial court=s
determination of those facts was not based on an evaluation of credibility and
demeanor, and (2) application‑of‑law‑to‑fact questions
that turn on an evaluation of credibility and demeanor.  Amador, 221 S.W.3d at 673; Montanez
v. State, 195 S.W.3d 101, 108B09 (Tex.
Crim. App. 2006); Johnson v. State, 68 S.W.3d 644, 652B53 (Tex.
Crim. App. 2002).  But when
application-of-law-to-fact questions do not turn on the credibility and
demeanor of the witnesses, we review the trial court=s rulings
on those questions de novo.  Amador,
221 S.W.3d at 673; Estrada v. State, 154 S.W.3d 604, 607 (Tex. Crim. App.
2005); Johnson, 68 S.W.3d at 652B53.

Stated
another way, when reviewing the trial court=s ruling
on a motion to suppress, we must view the evidence in the light most favorable
to the trial court=s ruling.  Wiede, 214 S.W.3d at 24; State v.
Kelly, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006).  When the trial court makes explicit fact
findings, we determine whether the evidence, when viewed in the light most
favorable to the trial court=s ruling,
supports those fact findings.  Kelly,
204 S.W.3d at 818B19. We then review the trial
court=s legal
ruling de novo unless its explicit fact findings that are supported by the
record are also dispositive of the legal ruling. Id. at 818.  We must uphold the trial court=s ruling if
it is supported by the record and correct under any theory of law applicable to
the case even if the trial court gave the wrong reason for its ruling.  State v. Stevens, 235 S.W.3d 736,
740  (Tex. Crim. App. 2007); Armendariz
v. State, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), cert. denied,
541 U.S. 974 (2004).

B.  Warrantless Arrest

1.  Applicable Law

Under the
Fourth Amendment, a warrantless arrest is unreasonable per se unless it
fits into one of a Afew specifically established and
well delineated exceptions.@  Minnesota v. Dickerson, 508 U.S. 366,
372, 113 S. Ct. 2130, 2135 (1993); Torres v. State, 182 S.W.3d 899, 901
(Tex. Crim. App. 2005). A police officer may arrest an individual without a
warrant only if probable cause exists with respect to the individual in
question and the arrest falls within one of the exceptions set out in the code
of criminal procedure.  Torres,
182 S.W.3d at 901; see Tex. Code Crim. Proc. Ann. arts. 14.01B.04
(Vernon 2005 & Supp. 2009).

Probable
cause for a warrantless arrest requires that the officer have a reasonable
belief that, based on facts and circumstances within the officer=s
personal knowledge, or of which the officer has reasonably trustworthy
information, an offense has been committed. 
Torres, 182 S.W.3d at 902. Probable cause must be based on
specific, articulable facts rather than the officer=s mere
opinion.  Id.; Ford v. State,
158 S.W.3d 488, 493 (Tex. Crim. App. 2005). 
We use the Atotality of the circumstances@ test to
determine whether probable cause existed for a warrantless arrest.  Torres, 182 S.W.3d at 902.  Additionally, probable cause is evaluated
based on the collective information known to the police, not just the stopping
or arresting officer. United States v. Hensley, 469 U.S. 221, 229B33, 105
S. Ct. 675, 681B82 (1985); Woodward v. State,
668 S.W.2d 337, 344B46 (Tex. Crim. App. 1982) (op. on
reh=g), cert.
denied, 469 U.S. 1181 (1985); see Armendariz, 123 S.W.3d at 404B05; Jackson
v. State, 745 S.W.2d 4, 8B9 (Tex.
Crim. App.), cert. denied, 487 U.S. 1241 (1988); see also Trimble v.
State, No. 02-08-00325-CR, 2009 WL 2138830, at *3 n.4 (Tex. App.CFort
Worth July 16, 2009, no pet.) (mem. op., not designated for publication)
(distinguishing collective information exception from cases in which the
information relied upon is from a citizen informant).

A
detention, as opposed to an arrest, may be justified on less than probable
cause if a person is reasonably suspected of criminal activity based on
specific, articulable facts.  Terry v.
Ohio, 392 U.S. 1, 22, 88 S. Ct. 1868, 1880 (1968); Carmouche v. State,
10 S.W.3d 323, 328 (Tex. Crim. App. 2000). 
An officer conducts a lawful temporary detention when he or she has
reasonable suspicion to believe that an individual is violating the law.  Ford, 158 S.W.3d at 492.  Reasonable suspicion exists when, based on
the totality of the circumstances, the officer has specific, articulable facts
that when combined with rational inferences from those facts, would lead him to
reasonably conclude that a particular person is, has been, or soon will be
engaged in criminal activity.  Id.
at 492.  This is an objective standard
that disregards any subjective intent of the officer making the stop and looks
solely to whether an objective basis for the stop exists.  Id.

2.  Analysis

The
record before us supports the trial court=s
conclusion that Officer Aldridge had reasonable suspicion to approach Campbell=s vehicle
and investigate, based on the dispatch about a possible drunk driver in a silver
Mitsubishi that was followed by Sergeant Polley.  See Ford, 158 S.W.3d at 492.  And we conclude that, on this record, Officer
Aldridge had probable cause after his initial investigation to make a
warrantless arrest of Campbell for public intoxicationCthat is,
the facts here show that Campbell was in a public place while intoxicated to
the degree that he might endanger himself or another.  See Tex. Penal Code Ann. ' 49.02
(Vernon 2003); Torres, 182 S.W.3d at 902. Specifically, Officer Aldridge
testified that with regard to his initial arrest or detention of Campbell for Aat least
a public intoxication,@ he had discovered Campbell
sleeping or passed out in his vehicle that was parked on a residential
neighborhood street and that Campbell smelled of alcohol, slurred his words,
and immediately reached for his keys that were still in the ignition upon
awakening.  See, e.g., Dickey v. State,
552 S.W.2d 467, 468 (Tex. Crim. App. 1977) (concluding that appellant violated
his probation by committing the offense of public intoxication when he became
so intoxicated that he fell asleep in a car in front of a lounge in the middle
of the night and noting, A[i]t is also possible that
appellant could have awakened and taken it upon himself to drive himself and
his companion home, which would have constituted an even clearer danger@).  Additionally, Officer Aldridge had probable
cause, after conferring with Sergeant Polley and performing the HGN field
sobriety test on Campbell, to arrest Campbell for DWI.  See Tex. Penal Code Ann. '' 49.01, 49.04
(Vernon 2003) (stating that a person commits an offense if he is intoxicatedCthat is,
does not have the normal use of his mental or physical faculties by reason of
the introduction of alcohol into the bodyCwhile
operating a motor vehicle in a public place); see also Armendariz, 123
S.W.3d at 404B05; Trimble, 2009 WL
2138830, at *3 & n.4.

The trial
court specifically concluded that Campbell was not in custody for purposes of Miranda
and article 38.22 when he admitted that he had been drinking.  However, we review the trial court=s legal
ruling de novo, and Campbell admitted that he had been drinking more than once
during his interaction with Officer Aldridge. 
What we must determine here, based on the totality of the circumstances,
is at what point Officer Aldridge took Campbell into custody for Miranda
purposes:  When he took Campbell=s keys,
when he handcuffed Campbell and placed him in the patrol car prior to
administering the HGN test, or when he replaced Campbell back in the patrol car
after the HGN test to take him to jail?

C.  Miranda Warnings

Campbell
contends that all evidence acquired after he was arrested without being given
his Miranda warnings was Afruit of
the poisonous tree@ that should have been excluded under
article 38.23(a) of the code of criminal procedure, and he specifically
complains that the following should have been suppressed: 








(1) A. . . Officer Aldridge
asked Mr. Campbell if he had been drinking and Mr. Campbell answered he had at
a friend[=]s house.@

 

(2) AOfficer Aldridge then
conducted the horizontal gaze nystagmus test which was another part of the
investigation.@

 

(3) A[At the
jail] . . . Officer [Aldridge] started asking if he wanted to take other tests
and stating this is not like the arrests you had before.@

1.  Initial Matters

We first
note that the HGN test and Officer Aldridge=s
statement at the jail did not require suppression.  This is because the Fifth Amendment applies
only to incriminating evidence that is testimonial in nature.  Williams v. State, 116 S.W.3d 788, 791
(Tex. Crim. App. 2003).  To be
testimonial, the communication must itself, explicitly or implicitly, relate a
factual assertion or disclose information. 
Id.  The court of criminal
appeals has held that sobriety tests yield physical evidence of a suspect=s mental
and physical faculties, and thus, the results are not testimonial evidence that
implicates Miranda.  Gassaway
v. State, 957 S.W.2d 48, 51 (Tex. Crim. App. 1997) (holding that field
sobriety tests do not violate the privilege against self‑incrimination).
Specifically, the court of criminal appeals has reasoned that field sobriety
tests are not testimonial because their results do not create Aan
express or implied assertion of fact or belief.@  Id.; see also Arthur v. State,
216 S.W.3d 50, 54B55 (Tex. App.CFort
Worth 2007, no pet.) (A[N]o Texas law requires that a
suspect be warned . . . before the administration of a field sobriety test.@).
Therefore, the results of Campbell=s HGN
test were not subject to suppression.

Furthermore,
the Fifth Amendment privilege against self-incrimination protected by the Miranda
warnings and the statutory protections set out in article 38.22 specifically
pertain to Astatement[s] of an accused made
as a result of custodial interrogation.@  Tex. Code Crim. Proc. Ann. art. 38.22, ' 3
(emphasis added); see U.S. Const. amend. V; see also Miranda, 384
U.S. at 476B77, 86 S. Ct. at 1629 (stating
that the Miranda warnings are Aprerequisites
to the admissibility of any statement made by a defendant,@
(emphasis added)).  Therefore, Officer
Aldridge=s
statement to Campbell regarding Campbell=s other
arrests was not subject to suppression under Miranda.

2.  Applicable Law

The need
for Miranda warnings arises when a person has been subjected to a
custodial interrogation.  Miranda,
384 U.S. at 444, 86 S. Ct. at 1612. Article 38.22 of the code of criminal
procedure generally precludes the use of statements that result from custodial
interrogation absent compliance with its procedural safeguards.  Tex. Code Crim. Proc. Ann. art. 38.22 (Vernon
2005); Arthur, 216 S.W.3d at 56.

Custodial
interrogation is questioning initiated by law enforcement officers after a
person has been taken into custody or otherwise deprived of his freedom of
action in any significant way.  Miranda,
384 U.S. at 444, 86 S. Ct. at 1612.  A
person held for an investigative detention is not in custody.  See Dowthitt v. State, 931 S.W.2d 244, 255
(Tex. Crim. App. 1996).  A person is in
custody only if, under the circumstances, a reasonable person would believe
that his freedom of movement was restrained to the degree associated with a
formal arrest.  Id.  Persons temporarily detained pursuant to
traffic stops are not in custody for the purposes of Miranda.  Berkemer v. McCarty, 468 U.S. 420,
440, 442, 104 S. Ct. 3138, 3150B51 (1984)
(determining that a motorist who was stopped for weaving on the road, subjected
to a modest number of questions by a patrolman, and who performed a balancing
test at a location visible to passing motorists, was not taken into custody for
purposes of Miranda). 

The court
of criminal appeals has outlined some general situations that may constitute
custody, including the following:  (1)
when the suspect is physically deprived of his freedom of action in any
significant way, (2) when a law enforcement officer tells the suspect he cannot
leave, (3) when law enforcement officers create a situation that would lead a
reasonable person to believe his freedom of movement has been significantly
restricted, and (4) when there is probable cause to arrest and law enforcement
officers do not tell the suspect he is free to leave.  Dowthitt, 931 S.W.2d at 252B55.  In the first, second, and third situations, the
restrictions upon freedom of movement must rise to the degree associated with
an arrest as opposed to an investigative detention.  Id. 
With regard to the fourth scenario, the officers=
knowledge of probable cause must be manifested to the subject.  Id.; see also State v. Stevenson,
958 S.W.2d 824, 828B29 (Tex. Crim. App. 1997)
(holding appellant=s statements admissible when the
investigation was no more intrusive than in Berkemer and holding that
even if appellant had become the focus of a DWI investigation, this fact alone
would not give rise to custody).  The
standard for distinguishing between an investigative detention and an arrest is
not always clearCboth constitute seizures.  Morris v. State, 50 S.W.3d 89, 94
(Tex. App.CFort Worth 2001, no pet.).

Furthermore,
there is no bright‑line rule that handcuffing a suspect always
constitutes an arrest.  See Rhodes v.
State, 945 S.W.2d 115, 118 (Tex. Crim. App.), cert. denied, 522 U.S.
894 (1997); see also State v. Sheppard, 271 S.W.3d 281, 283 (Tex. Crim.
App. 2008) (A[A] person who has been
handcuffed has been >seized= and
detained under the Fourth Amendment, but he has not necessarily been >arrested.=@).  Although handcuffing the suspect is not ordinarily
proper during an investigative detention, it may be resorted to when reasonably
necessary to effect the goal of the detention: 
investigation, maintenance of the status quo, or officer safety.  See Rhodes, 945 S.W.2d at 117.  The degree of force employed by a police
officer is just one of several factors that must be considered to determine
whether a particular seizure of a person is an arrest or merely an
investigative detention.  State v.
Moore, 25 S.W.3d 383, 386 (Tex. App.CAustin
2000, no pet.). The nature of the crime under investigation, the degree of
suspicion, the location of the stop, the time of day, and the reaction of the
suspect are all facts which bear on the issue. 
See id. (citing 4 Wayne R. LaFave, Search and Seizure ' 9.2(d)
(3d ed.1996)).  The officer=s
opinion, while not determinative, is another factor to be considered.  See id. (citing Amores v. State,
816 S.W.2d 407, 412 (Tex. Crim. App. 1991)); see also Rhodes v. State,
913 S.W.2d 242, 247 (Tex. App.CFort
Worth 1995), aff=d, 945
S.W.2d 115 (Tex. Crim. App. 1997).  It is
also important to consider whether the officer actually conducts an
investigation after seizing the suspectCthat is,
whether the officer briefly questions the suspect about his identity, his
reason for being in the area, or similar reasonable inquiries of a truly
investigatory nature as contemplated by Terry v. Ohio.  See Amores, 816 S.W.2d at 412; see
also Rhodes, 945 S.W.2d at 119B20
(Meyers, J., concurring and dissenting) (discussing the differences between an
arrest and an investigatory stop). Whether a seizure is an actual arrest or an
investigative detention depends on the reasonableness of the intrusion under
all of the facts.  Morris, 50
S.W.3d at 95.

3.  Analysis 

The only
evidence potentially subject to suppression based on the testimony at trial was
Campbell=s
statement to Officer Aldridge that he had been drinking with some friends, in
response to Officer Aldridge=s
question as to whether Campbell had had anything to drink that night, and Campbell=s
statement that he had not been driving, in response to Officer Aldridge=s
question as to whether he had been driving. 
The only evidence potentially subject to suppression from the DVD,
although not specifically complained of by Campbell,[5]
would have been Officer Aldridge=s
questions about how much Campbell had had to drink and whether it was a couple
of beers, to which Campbell replied, Ayes@; Officer
Aldridge=s
question about whether Campbell knew he was not old enough to be drinking, to which
Campbell responded, Ayes@; Officer
Aldridge=s
follow-up question, ABut you did it anyway.  Right?@ to which
Campbell responded, ARight@; Officer
Aldridge=s
question about where he had been that nightCCampbell=s
response is mostly unintelligible; and Officer Aldridge=s
question that if Campbell was not the driver, who was, in response to Campbell=s
insistence that he had not been driving.

We have
found one opinion, unpublished, that addresses whether an appellant is under
arrest when an officer takes his car keys.  White v. State, No. 08-06-00050-CR, 2007
WL 853134, at *1, 4 (Tex. App.CEl Paso
Mar. 22, 2007, no pet.) (not designated for publication).  In White, the officer testified that
he pulled the appellant over after he saw him speeding on the interstate around
11 p.m.  Id. at *1.  As he approached the pulled-over vehicle, the
appellant rolled down his car window, and he saw the appellant=s glazed
eyes and smelled alcohol coming from the vehicle and on the appellant=s
breath.  Id.  In response to his questions, the appellant
said that he had just left a nightclub where he had had three drinks; the
officer noted that appellant had difficulty understanding questions and slurred
his speech.  Id.  The officer asked the appellant to remove the
keys from the ignition, explained to the appellant Athat this
was to prevent him from driving off and as a safety measure for his own safety,@ and
placed the keys on top of the car.  Id.  The officer testified that the appellant was
not under arrest at the time, but he was not free to leave as he was suspected
of DWI and he needed the appellant to wait there because he was not certified
to conduct field sobriety tests and had to request that a DWI unit be sent to
the scene.  Id.  The El Paso court concluded that the
appellant was not in custody when the officer took his keys; rather, he was
still being detained because the officer=s
suspicion that the appellant was intoxicated had not been dispelled or
confirmed.  Id. at *4.  The court also noted that allowing the
appellant to leave or retain his keys could have posed a danger to himself and
others.  Id.








The facts
here are not those of a traditional traffic stopCCampbell=s vehicle
was parked when Officer Aldridge arrived on the scene, and Campbell was either
passed out or asleep when Officer Aldridge opened the car door. Officer
Aldridge gave Campbell no explanation for taking his car keys, and he retained
the keys during their interaction. 
Nonetheless, Officer Aldridge=s actions
immediately after taking the keys and before placing Campbell in handcuffs
appear to be part of a continuing investigationChe asked
Campbell how old he was, whether he had any identification, and how much he had
had to drink that night and whether it was a couple of beers.  See id. at *1, 4.  We conclude that Campbell was not in custody
when Officer Aldridge took his keys or asked him questions prior to placing him
in handcuffs.  Therefore, Campbell=s responses
or affirmationsCthat he was nineteen, that he did
not have identification on him, and that he had had a couple of beersCwere not
subject to suppression under article 38.22 or Miranda.  See Tex. Code Crim. Proc. Ann. art.
38.22, ' 3
(requiring custodial interrogation); see also Miranda, 384 U.S. at 444,
86 S. Ct. at 1612.  This is congruous
with the trial court=s conclusion that Officer
Aldridge had reasonable suspicion to detain Campbell for further investigation
and to ask a moderate number of questions to confirm or dispel his suspicions
and that Campbell was not in custody when he admitted that he had been
drinking.

However,
some statements potentially subject to suppression remain because they occurred
in response to Officer Aldridge=s
questions both after he took Campbell=s keys
and immediately after he placed Campbell in handcuffs: that he knew he was not
old enough to be drinking, that he had been drinking with some friends or at a
friend=s house,[6]
and that he had not been driving. The trial court does not appear to have
considered these additional statements in its findings of fact or conclusions
of law.








Officer
Aldridge did not testify that he handcuffed Campbell for officer safety
purposes, to continue his investigation, or to maintain the status quo. See
Rhodes, 945 S.W.2d at 117.  The
handcuffing occurred after midnight on a residential street, and the DVD
reveals that two other officers were on the scene with Officer Aldridge.  See Moore, 25 S.W.3d at 386.  Further, Officer Aldridge gave contradictory
testimony, admitting on cross-examination that he continued to ask Campbell
questions even though he was arresting him based on public intoxication but
also stating that Campbell was detained to investigate.  See id. 
After handcuffing Campbell, he asked him additional questions beyond
those that would normally be part of a Terry stop (i.e., identification
questions) and then placed Campbell in his patrol unit.  See Amores, 816 S.W.2d at 412.  And he did not conduct any additional investigation
directly involving Campbell=s
activities or identity until after speaking with Sergeant Polley, who prompted
him to administer sobriety tests to Campbell.[7]

While
handcuffing does not always constitute an arrest, we hold that it did here, in
light of the circumstances under which Campbell was physically deprived of his
freedom of action and under which a reasonable person would believe his freedom
of movement had been significantly restricted. 
See Dowthitt, 931 S.W.2d at 254B55; see
also Alford v. State, 22 S.W.3d 669, 671B72 (Tex.
App.CFort
Worth 2000, pet. ref=d) (holding that appellant was in
custody when he was stopped, placed on the ground, and handcuffed, and his
response, that he had had six beers, when asked if he had been drinking by an
officer who arrived on the scene seven minutes later, should have been
suppressed since he was not given his Miranda warnings); Jordy v.
State, 969 S.W.2d 528, 531B32 (Tex.
App.CFort
Worth 1998, no pet.) (holding that appellant was subjected to a custodial
interrogation following a traffic accident when he laid down on the ground and
the officer called an ambulance before asking appellant how much he had had to
drink, to which appellant replied, AA lot.@).  But see Rhodes, 945 S.W.2d at 117B18
(holding that incident was temporary investigative detention when officer
testified at suppression hearing that he was not arresting Rhodes when he
handcuffed him and that he handcuffed him primarily out of concern for officer
safetyCit was
dark, the area was high-crime, and officer was alone with suspect); Arthur,
216 S.W.3d at 53, 57B58 (holding that appellant=s
statements were not a product of custodial interrogation when officer saw
appellant=s vehicle drifting and speeding,
initiated a traffic stop and asked some questions about whether she had had
anything to drinkCwhich she answered inconsistently
and in a loud, moderately slurred voiceCand
administered three sobriety tests and a portable breath test before arresting
her); Hernandez v. State, 107 S.W.3d 41, 47B48 (Tex.
App.CSan
Antonio 2003, pet. ref=d) (concluding that appellant=s
statement that he had consumed nine beers was made during investigatory
detention after officer saw appellant speeding and weaving between lanes
without signaling, pulled him over, noticed the smell of alcohol and appellant=s
bloodshot eyes, and administered three field sobriety tests, all prior to full
custodial arrest); Wappler v. State, 104 S.W.3d 661, 668 (Tex. App.CHouston
[1st Dist.] 2003) (concluding that it was reasonable for the officer to secure
appellant in handcuffs when appellant was uncooperative and belligerent, so
that officer could complete his DWI investigation), rev=d on
other grounds, 138 S.W.3d 331 (Tex. Crim. App. 2004); Lewis
v. State, 72 S.W.3d 704, 708B13 (Tex.
App.CFort
Worth 2002, pet. ref=d) (distinguishing Jordy
and Alford as presenting Aother
circumstances@ requiring Miranda when
their facts went beyond the roadside questioning and sobriety tests found in
DWI temporary investigation cases).

The
failure to suppress Campbell=s
statements made after he was arrested for public intoxication without his Miranda
warnings constituted error.  Additionally,
we are concerned about the testimony that Officer Aldridge gave after he
testified that he arrested Campbell based on public intoxication and that
Campbell was not free to leave:

 

Q.  Okay.  And all the time while you are at least
arresting him based upon a public intoxication, correct?

 

A.  Uh‑huh.

 

Q.  Okay.  Now, typically if you doCif you arrest somebody,
aren=t you supposed to
immediately give them their Miranda rights?

 

A.  No.

 

Q.  Okay.  So you are free, under your training, to
continue to interrogate an individual without giving Miranda warnings?

 

A.  We can ask questions.

 

Q.  You can ask questions without
advising them of the right to remain silent?

 

A.  Correct.

 

Q.  Okay.  And this is from your training?

 

A.  Yes.

 

 








Q.  So you could arrest anyone
that you think has committed a crime and continue to ask them questions without
giving the Miranda warnings?

 

A.  No.  It=s going to depend on the offense, you know.  A public intoxication or minor in consumption
[sic], I don=t have to read them
Miranda.   

 

Q.  So you don=t always have to read Miranda
rights when you put somebody under arrest?

 

A.  Right.

Wrong.  See Wicker v. State, 740 S.W.2d 779,
786 (Tex. Crim. App. 1987) (AMiranda has
since been extended to cover custodial interrogation of one suspected of even a
misdemeanor traffic offense.@), cert.
denied, 485 U.S. 938 (1988); Alford, 22 S.W.3d at 671B73
(stating same).

Because
we have found error, we must perform a harm analysis, and because we determine
that the error is constitutional, we apply rule 44.2(a).  See Tex. R. App. P. 44.2(a); Jones
v. State, 119 S.W.3d 766, 776B77 (Tex.
Crim. App. 2003) (applying rule 44.2(a) analysis to Miranda violation),
cert. denied, 542 U.S. 905 (2004). 
We must reverse unless we determine beyond a reasonable doubt that the
trial court=s failure to suppress these
statements did not contribute to Campbell=s
conviction or punishment.  See
Tex. R. App. P. 44.2(a); Hernandez v. State, 60 S.W.3d 106, 108 (Tex.
Crim. App. 2001).

In
applying the Aharmless error@ test, our
primary question is whether there is a Areasonable
possibility@ that the error might have
contributed to the conviction.  Mosley
v. State, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh=g), cert.
denied, 526 U.S. 1070 (1999).  Our
harmless error analysis should not focus on the propriety of the outcome of the
trial; instead, we should calculate as much as possible the probable impact on
the jury in light of the existence of other evidence.  Wesbrook v. State, 29 S.W.3d 103, 119
(Tex. Crim. App. 2000), cert. denied, 532 U.S. 944 (2001).  We consider the source and nature of the
error, the extent that it was emphasized by the State, its probable collateral
implications, the weight a juror would probably place on the error, and whether
declaring it harmless would be likely to encourage the State to repeat it with
impunity.  Harris v. State, 790
S.W.2d 568, 587 (Tex. Crim. App. 1989). 
This requires us to evaluate the entire record in a neutral, impartial,
and even-handed manner, not Ain the
light most favorable to the prosecution.@  Id. at 586.

The
source of the error was Officer Aldridge=s
misunderstanding of when to give Miranda warnings.  He asked three questions after arresting
Campbell and prior to giving him the Miranda warnings that are relevant
to the DWI charge,[8]
which elicited the following incriminating information from Campbell that was
presented before the jury:  Campbell had
been drinking that night with some friends, and he denied that he had been
driving, contrary to what the DVD showed and to Sergeant Polley=s
testimony.

During
closing arguments, the State waived its opening.  During its rebuttal, the prosecutor first
referenced Campbell=s slurred speech that the jury
saw in the published exhibits and then briefly referenced Campbell=s
statements, stating, AHe toldCTrent
Campbell said he was drinking that night. 
He told Officer Aldridge[, >]I=ve been
drinking at a friend=s house.[>]@  However, the State placed the most emphasis
during its rebuttal on Campbell=s driving,
described by Sergeant Polley, and on Campbell=s overall
intoxicated demeanor, described by Officer Aldridge.

As
recounted above, besides Campbell=s
statement through Officer Aldridge=s
testimony that he had been drinking with his friends, the jury heard testimony
from Sergeant Polley about Campbell=s
hazardous driving, including that Campbell=s vehicle
almost ended up in a bar ditch numerous times, that Campbell=s vehicle
almost hit a culvert and crossed the center line several times, and that he
feared for the driver=s safety and the safety of others
because of this.  The jury also heard his
testimony that no one entered or exited the vehicle after it came to a
stop.  And the jury heard Officer
Aldridge=s
testimony about finding Campbell either asleep or passed out in the same
vehicle, Campbell=s smell of alcohol and
word-slurring, and Campbell=s
performance on the HGN test.  The jury
heard Campbell=s slurred speech when the
exhibits were played at trial and saw Campbell pause before reciting his birth
date on the jail videotape.  And because
Campbell=s
response to Officer Aldridge=s
question regarding whether he had had a couple of beers that night occurred
before he was taken into custody, the jury was free to consider this statement
in conjunction with all of the other evidence.

In light
of all of this other evidence, the probable impact on the jury of Campbell=s
statement that he had been drinking at a friend=s house
was minimal.  That is, the jury could
have concluded beyond a reasonable doubt that Campbell had operated the silver
Mitsubishi while not having the normal use of his mental or physical faculties
by reason of the introduction of alcohol into his body from the officers=
testimony, from Campbell=s demeanor on the DVD and videotape,
and from Campbell=s own statement prior to being
taken into custody that he had been drinking alcohol that night, even if
Campbell had never made the statement that he had been drinking with
friends.  Furthermore, declaring the
error harmless here is unlikely to encourage the State to repeat it with
impunity in light of the specific facts here and with regard to the fine line
between investigative detentions, which do not require Miranda warnings,
and custodial interrogations, which do.

Therefore,
after carefully reviewing the record and performing the required harm analysis
under rule 44.2(a), we hold beyond a reasonable doubt that the trial court=s error
did not contribute to Campbell=s
conviction or punishment. Tex. R. App. P. 44.2(a).  And because we hold that the error in failing
to administer his Miranda warnings did not contribute to Campbell=s
conviction or punishment beyond a reasonable doubt under rule 44.2(a), we need
not also analyze whether admission of the same statement in violation of
section 38.22 violated Campbell=s
substantial rights under rule 44.2(b).  See Tex. R. App. P. 47.1; see also
Woods v. State, 152 S.W.3d 105, 118 (Tex. Crim. App. 2004) (stating that
the erroneous admission of an appellant=s
statement in violation of article 38.22 amounts to nonconstitutional error), cert.
denied, 544 U.S. 1050 (2005).  We
overrule Campbell=s sole point.

IV. 
Conclusion

Having
overruled Campbell=s sole point, we affirm the trial
court=s
judgment.

 

BOB MCCOY

JUSTICE

 

 

PANEL:  LIVINGSTON, C.J.;
DAUPHINOT and MCCOY, JJ.

 

DAUPHINOT, J. filed a concurring opinion.

 

PUBLISH

 

DELIVERED: June 17, 2010

 

 











 
 
 
 
 
 
 




 

 

 

 

 

 

                                                COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                                 NO.
2-08-262-CR

 

 

TRENT MICHAEL CAMPBELL                                                            APPELLANT

 

 

                                                             V.

 

 

THE STATE OF TEXAS                                                                             STATE

 

                                                       ------------

 

          FROM
COUNTY CRIMINAL COURT NO. 10 OF TARRANT COUNTY

 

                                                       ------------

 

                                        CONCURRING OPINION

 

                                                       ------------

I
concur in the majority=s thoughtful and well
reasoned opinion.  A new folk myth
appears to have developed among law enforcement officers, judges, and lawyers
that driving while intoxicated (DWI) is an exception to the protections of the
Fourth and Fifth Amendments to the Constitution of the United States and to the
protections of the comparable portions of our state constitution and code of
criminal procedure.  I write separately
to point out the confusion that has arisen in our law regarding what the
holding in Miranda v. Arizona[1] means.

[T]he
prosecution may not use statements, whether exculpatory or inculpatory,
stemming from custodial interrogation of the defendant unless it demonstrates
the use of procedural safeguards effective to secure the privilege against
self-incrimination.  By custodial
interrogation, we mean questioning initiated by law enforcement officers after
a person has been taken into custody or otherwise deprived of his freedom of
action in any significant way.[2]

In Hiibel
v. Sixth Judicial Dist. Court,[3] the United
States Supreme Court clarified the parameters of the investigative detention
and interrogation.  In an analysis
similar to that employed in Crawford v. Washington,[4]
the Court concentrated on whether the questioning during an investigative
detention was testimonial:  

To qualify for the Fifth Amendment privilege,
a communication must be testimonial, incriminating, and compelled.

. . . . A[T]o be testimonial, an accused=s communication must
itself, explicitly or implicitly, relate a factual assertion or disclose
information.@  Stating one=s name may qualify as
an assertion of fact relating to identity. 
Production of identity documents might meet the definition as well.  As we noted in Hubbell, acts of
production may yield testimony establishing Athe existence, authenticity, and custody of
items [the police seek].@

 

. . . . 

 








As we stated in Kastigar v. United States,
the Fifth Amendment privilege against compulsory self-incrimination Aprotects against any
disclosures that the witness reasonably believes could be used in a criminal
prosecution or could lead to other evidence that might be so used.@[5]

 

The
three prongs of the test to trigger the Fifth Amendment, then, are that the
statement is testimonial, incriminating, and compelled.  The Miranda court held that a
statement is compelled when it is in response to Aquestioning
initiated by law enforcement officers after a person has been taken into
custody or otherwise deprived of his freedom of action in any significant way.@[6]

Based
on Sergeant Polley=s testimony, he had probable
cause to arrest Appellant Trent Michael Campbell for reckless driving or a
traffic violation.  As the majority so
cogently points out, when Officer Aldridge walked up to Appellant who was
sleeping, Aldridge had probable cause to arrest Appellant for public
intoxication.  Any claim that further
investigation was necessary regarding the reckless driving is specious.  Appellant was finished driving for the
night.  When Appellant attempted to reach
for the keys in the ignition, the officer took the keys away and told him to
get out of the car.  Not only should it
have been clear to Appellant that his movements were restricted to those
permitted by the police officers, had he tried to leave, he would have been
guilty of a criminal offense.

Section
38.04 of the penal code provides that a person commits an offense if he
intentionally flees from a person he knows is a peace officer attempting
lawfully to arrest or even merely to detain him.[7]  In Texas and under the mandate of section
38.04, a person whom a police officer decides to detain is never free to
leave.  No matter how temporary the
detention, that person is not free to leave until the officer decides to allow
him to leave.  Clearly, when a peace officer
in Texas decides to detain a person, that person has been Adeprived
of his freedom of action in [a] significant way,@[8] and
to attempt to do anything other than submit to the officer=s
show of authority constitutes a crime punishable by incarceration.  As I have stated elsewhere, 

Although
courts speak of a person=s being free to leave
when a police officer approaches him, courts also hold fairly regularly that
walking or running away when an officer approaches provides reasonable
suspicion for the officer to detain the person. 
It is, indeed, a lose, lose situation for any person a police officer
wants to speak to.  He is free to leave,
unless he leaves.[9]

 

To
claim that Appellant was free to leave after the police cars converged on the
scene would be a fiction totally unsupported by the record.  And as the majority so astutely notes,
Appellant was going to jail for something. 
The only question was what.

Courts
and lawyers and commentators have spent years trying to construe exactly what
the Miranda court meant by 

[T]he
prosecution may not use statements, whether exculpatory or inculpatory,
stemming from custodial interrogation of the defendant unless it demonstrates
the use of procedural safeguards effective to secure the privilege against
self-incrimination.  By custodial
interrogation, we mean questioning initiated by law enforcement officers after
a person has been taken into custody or otherwise deprived of his freedom of
action in any significant way.[10]

 

Perhaps it is time to
conclude that sometimes courts mean exactly what they say:  the prosecution may not use any statement
stemming from questioning initiated by law enforcement officers when a person
is not free to walk, or to run, or to drive away, unless the person has been
warned on the spot that he does not have to answer the questions, can have a
lawyer present to give him advice, even if he is so poor that the government
has to pay for the lawyer, and that he can stop answering questions anytime he
decides to stop.

Maybe
the Miranda court meant just exactly what they said.  And under Texas law, a person must be warned
anytime the police detain him and start asking questions because that person is
never free to leave.  And if he had been
free to leave, deciding to walk away would have put an end to that freedom.

Because
in the case before us the officer candidly admitted that he believed DWI,
public intoxication, and minor in possession offenses to be exceptions to the
mandates of the prohibitions against self-incrimination, and because he acted
accordingly, the trial court should have suppressed the statements that were
testimonial and incriminating (although the Miranda court specifically
referred to both inculpatory and exculpatory statements).[11]  But because the remaining evidence of guilt
is both overwhelming and untainted by the improperly admitted statements, I
join the majority=s conscientiously accurate
and legally sound opinion.

 

LEE ANN DAUPHINOT

JUSTICE

 

PUBLISH

DELIVERED: June 17, 2010











[1]Sergeant Polley testified,


 

One of the times that
[Campbell] had driven off onto the right-hand side, they have an old culvert or
bridge for when it rains and it=s from the 30s, when the public works commission
was going on and it=s a solid concrete wall
that comes up out of the ground about four feet.  And I was absolutely scared that he was going
to hit that, and I was hoping that he didn=t, but at the last second he jerked it back to the
left.





[2]Sergeant Polley testified
that he did not approach the Mitsubishi because he was dressed in plain
clothes, he did not have proper equipment to conduct an investigation, and he
knew that Officer Aldridge was on his way.





[3]Miranda v. Arizona, 384 U.S. 436, 86 S. Ct.
1602 (1966).





[4]Finding #6 states, 

 

After smelling alcohol on
the defendant=s person, and after the
defendant admitted that he had been drinking, Officer Aldridge handcuffed the
defendant and placed him in his patrol unit. 
Officer Aldridge conferred briefly with Sgt. Polley, then removed the
defendant from the backseat of his patrol unit, and administered the horizontal
gaze nystagmus test.  The defendant
exhibited all six clues of intoxication. 
Aldridge asked the defendant if he would submit to additional field
sobriety tests, but he refused. [Record citations omitted.]





[5]Campbell broadly complains
that all statements made after his arrest should have been suppressed, but he
only specifically complains about the three items listed above.





[6]On the DVD, after
handcuffing Campbell, Officer Aldridge asks him where he had been that
night.  Campbell=s response on the DVD is mostly
unintelligible except for the word Ahouse.@  However,
this question appears to match up with Officer Aldridge=s testimony that Campbell
said that he had been drinking with some friends.





[7]Defense counsel asked
Sergeant Polley, AAnd did you do any additional
investigation after [Campbell] was detained and handcuffed?@  He responded, @Actually, now that you
bring that up, I believe it was that I did instruct Officer Aldridge he
probably needed to do SFSTs [standard field sobriety tests] for DWI at which
point in time that=s when he got started.@





[8]That is, whether he had
been drinking, where he had been that night, and who was driving if Campbell
was not the driver.





[1]384 U.S. 436, 86 S. Ct.
1602 (1966).





[2]Id. at 444, 86 S. Ct. at 1612
(emphasis added).





[3]542 U.S. 177, 124 S. Ct.
2451 (2004).





[4]541 U.S. 36, 38, 124 S.
Ct. 1354, 1357 (2004). 





[5]Hiibel, 542 U.S. at 189B90, 124 S. Ct. at 2460
(citations omitted).





[6]384 U.S. at 444, 86 S. Ct.
at 1612.





[7]Tex. Penal Code Ann. ' 38.04 (Vernon Supp.
2009).





[8]384 U.S. at 444, 86 S. Ct.
at 1612 (emphasis added).





[9]State v. Woodard, No. 02-09-052-CR, 2010
WL 1268035, at *14 (Tex. App.CFort Worth April 1, 2010, pet. filed) (Dauphinot,
J., dissenting).





[10]384 U.S. at 444, 86 S. Ct.
at 1612 (emphasis added).





[11]See id.















 [CB1]Majority
by McCoy; Dauphinot concurrs